IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EMMANUEL PAGE,

                          Plaintiff,                OPINION AND ORDER

        v.                                          23-cv-17-wmc

CLINTON F. BRYANT, L. WEBER, LEINWEBER,
SARGENT ANDERSON, SARGENT BROWN, and
SARGENT DURAN,

                    Defendant.

Through his counsel, plaintiff Emmanuel Page, who is currently incarcerated at Marshall E. Sherrer Correctional Center, claims that six Oakhill Correctional Institute ("Oakhill") employees failed to address adequately an ant infestation and a dilapidating wall in his room. The court previously granted Page leave to proceed against these defendants on Eighth Amendment conditions of confinement claims and Wisconsin state-law negligence claims.[1] Defendants have moved for summary judgment. (Dkt. #26.) For the following reasons, the court will grant summary judgment on the merits of plaintiff's Eighth Amendment claims against defendants Bryant, Duran and Weber, while finding that the remaining defendants are entitled to qualified immunity on those claims. Having found in favor of defendants on plaintiff's federal constitutional claims, the court will dismiss without prejudice plaintiff's remaining state law claims for lack of subject matter jurisdiction.

---

[1] The court also granted Page leave to proceed on an Eighth Amendment medical care claim against Sergeant Anderson, but the court previously granted Anderson's motion for partial summary judgment based on exhaustion as to that claim. (Dkt. #23.)

UNDISPUTED FACTS[2]

**A. Background**

At all times relevant to this lawsuit, Page was an inmate in the custody of the Wisconsin Department of Corrections ("DOC") at Oakhill, while Warden Clinton Bryant, Buildings and Grounds Supervisor Kenneth Leinweber, Unit Manager Program Supervisor Lucas Weber, Correctional Sergeants Curtis Anderson and Jack Duran, and Dylan Brown were all DOC employees at Oakhill.

Page resided in room 106 of cottage 10 from February 24 to June 14, 2022. (Anderson Decl. (dkt. #30) ¶¶ 8-9.) Page's bed was bolted to the floor against an interior wall that was adjacent to the shower. Page avers that, because of water damage from the shower, the wall next to his bed was dilapidated, resulting in dust, plaster, concrete, joint compound, paint chips and other material falling onto his bed. (Page Decl. (dkt. #36-1) ¶ 4.) He also asserts that the baseboard had water damage, resulting in black mold and an odor. (*Id.* ¶ 6.) Page adds that ants, spiders, roaches, silverfish and boxelder bugs entered through "gaping" holes, cracks and crevices in the baseboard.[3] (*Id.* ¶ 7.) As a result, he avers, there were "many nights" when ants crawled over him and into his mouth, bit him, and destroyed his property. (*Id.* ¶ 18.)

---

[2] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to the plaintiff as the non-moving party.

[3] Defendants assert that Page lacks personal knowledge to state that the baseboard was water-damaged with black mold and holes, but Page could certainly observe those features of the room.

## B. Page's Complaints and Work Orders

To initiate a room repair, prisoners asked a housing sergeant to place a work order. The housing sergeants acted as gatekeepers, verifying that the work needed to be completed. Once a request was sent to maintenance, it was routed to Oakhill maintenance workers or an outside contractor. When a work order was pending, it was useless to submit another work order for the same issue. Because insects were known to be an issue at Oakhill in particular, the DOC contracted with a pest control company to provide monthly preventative maintenance and remove insects.

Between March and May 2022, defendants submitted four work orders for Page's room. *First*, on March 25, (presumably Officer) Brown submitted a work order for Room 106, writing "have ants in cell." (Ex. 1000 (dkt. #31-1) 1.) For his part, Page asserts that he showed Brown the dilapidated walls and hundreds of ants coming from the walls. (Page Decl. (dkt. #36-1) ¶¶ 13-14.) The order was assigned to "staff, general" and completed on April 13, 2022, when a pest control person then sprayed his room for bugs.[4] (*Id.* ¶ 16; Ex. 1000 (dkt. #31-1) 1.)

*Second*, on April 23, Sergeant Anderson submitted another work order for Room 106, writing that there was a "bug problem coming from the wall." (Ex. 1000 (dkt. #31-1) 2.) Page asserts that he showed bugs crawling on his bed to Sergeant Anderson (Page Decl. (dkt. #36-1) ¶¶ 18-19), while Anderson asserts that he only saw one ant in Page's cell and did not personally see bugs coming from the wall. (Anderson Decl. (dkt. #30)

---

[4] Page asserts that the pest control person told him that his room had a "maintenance problem," but the pest control person's statement is inadmissible hearsay at least for the truth of that assertion. Fed. R. Evid. 801(c)(2).

¶¶ 21, 26.)   Although the April 23 work order was initially assigned to Supervisor Leinweber, the request was again routed to a pest control company, and the work order was marked as completed on April 27.  (*Id.* ¶ 27; Ex. 1000 (dkt. #31-1) 2.)

On April 27, Page also asserts that he asked Sergeant Anderson to move him to a different room, but he apparently refused.  (Page Decl. (dkt. #36-1) ¶ 23.)  Anderson disputes this as well, asserting that he offered to move Page to a different room on multiple occasions, but *Page* refused.  (Anderson Decl. (dkt. #30) ¶ 42.)  Page further asserts that he also asked Anderson, Brown, Duran, Weber, and Bryant to move him out of room 106, but they did not move him until June 14, more than two months after he began to complain about the condition of his room.  (Page Decl. (dkt. #36-1) ¶ 86.)  Finally, Page asserts that Sergeant Anderson told him that, if he kept complaining, he would move Page out of the room and move in an inmate who would not complain about the room, to which Page responded that was not the solution.  (*Id.* ¶¶ 31-33.)

*Third*, Page asserts that Sergeant Duran witnessed the "nature and conditions of the room" (*id.* ¶ 26), and on April 27, he submitted an "urgent" work order, writing, "RM 106 is stating there's an ant problem and right[-]side wall keep[s] [peeling] off where [Page] has white wall particles on [him] and on [his] bedding."  (Ex. 1000 (dkt. #31-1) 3.)  That order was assigned to "staff, general" (*id.*), and Page avers that the pest control person again sprayed his room.  (Page Decl. (dkt. #36-1) ¶ 27.)  While defendants dispute that pest control returned following Page's third complaint, they cite no evidence, other than that the work order was routed to "staff, general."  (Ex. 1000 (dkt. #31-1) 3.)  Moreover, the April 27 work order was marked as completed on May 24.  (Ex. 1000 (dkt. #31-1) 3.)

4

*Fourth*, on May 3, Unit Manager Weber submitted a work order, writing, "[p]ieces of the ceiling/wall are falling on [Page] during sleep. Also, ants in room." (*Id.* at 4.) Weber also noted that the bathroom needed to be sealed. (*Id.*) Page similarly asserts that "sometime in May," he had complained to Weber about the insect infestations and dilapidated walls, telling him that he wanted to be moved or the room repaired. (Page Decl. (dkt. #36-1) ¶¶ 35-36.) On unspecified dates, Page adds that he also informed Warden Bryant about the condition of his room and the effects on his health during his unit walkthroughs. (*Id.* ¶ 50.)

Weber's work order was assigned to Leinweber. (Ex. 1000 (dkt. #31-1) 4.) Leinweber avers that sometime before Page left Room 106, he inspected Page's room, but he saw no pests or deteriorating wall, while Page asserts that Leinweber never went into his room. (Leinweber Decl. (dkt. #29) ¶¶ 77, 80-82; Page Decl. (dkt. #36-1) ¶ 53.) Weber's work order was marked as complete on June 9. (Ex. 1000 (dkt. #31-1) 4.) Page was then moved to a different room on June 14, where he continued to experience respiratory symptoms. (Page Decl. (dkt. #36-1) ¶¶ 64-65.)

Later in May, Page also asserts he told Brown that the dilapidated walls and bug infestation had not been resolved, and Brown told him that he would put in another work order, but apparently never did. (*Id.* ¶ 39.) Page further asserts, again "sometime in May," he told Sergeants Anderson, Brown and Duran that his room conditions were worsening his respiratory issues, to which Anderson and Brown told him to "stop complaining" because they were putting in a work order to fix the room. (*Id.* ¶¶ 45-46.) In June 2022, Page avers that his chronic obstructive pulmonary disease ("COPD") and asthma

symptoms worsened, including suffering from shortness of breath, choking, coughing and fatigue.  (*Id.* ¶ 52.)[5]

    After Page vacated Room 106, Supervisor Leinweber avers that staff discovered the wall next to Page's bed in Room 106 was "blistering," but denies that it was wet and asserts the interior of the wall was dry.  (Leinweber Decl. (dkt. #29) ¶¶ 88-91.)  Maintenance staff then replaced that part of the wall.  (*Id.* ¶ 94.)


OPINION

    Defendants move for summary judgment on plaintiff's Eighth Amendment and state-law negligence claims.  A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party."  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (alteration adopted and quotation marks omitted).  Given the numerous factual disputes, and under-developed record, the court will deny summary

---

[5] Defendants argue that Page lacks personal knowledge to state that his room conditions worsened his respiratory conditions.  To be sure, plaintiff lacks a medical expert's knowledge to opine as to the causal link between his room conditions and his worsening respiratory conditions.  *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) ("A nonexpert is not permitted to give expert testimony. Wholly lacking in medical knowledge as he was, the plaintiff was incompetent to testify on the causal relation if any between exercise and healthy gums." (citation omitted)).  Nonetheless, the court considers the evidence to the extent that Page offers it to show that he complained to defendants about his room and his respiratory condition worsened while housed in Room 106.

judgment on the merits as to plaintiff's Eighth Amendment claims against defendants Leinweber, Anderson and Brown, but grant summary judgment as to plaintiff's claims against Bryant, Duran and Weber.  Ultimately, however, the remaining defendants are entitled to good faith immunity given the uncertainty of the law with respect to the duration of any defendant's failure to act (approximately 81 days), the severity of the conditions in the room, and plaintiff's concession that he did not raise his worsening respiratory issues until shortly before being transferred from Room 106.

## I.  Plaintiff's Eighth Amendment Claims Against Supervisor Leinweber, Brown and Sergeant Anderson

To establish an Eighth Amendment violation as to prison living conditions, an inmate must be able to demonstrate that: (1) the conditions were "sufficiently serious" to have deprived him "of the minimal civilized measure of life's necessities" (the objective prong); and (2) the defendants acted with deliberate indifference with respect to the conditions (the subjective prong).  *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (quotation marks omitted).

Defendants argue that: (1) the alleged ant infestation was insufficiently serious to support an Eighth Amendment claim; (2) they were not deliberately indifferent to plaintiff's conditions of confinement, but rather repeatedly put in work orders to resolve the claimed issues; (3) alternatively, they are protected by qualified immunity; and (4) even if found liable, plaintiff has not shown that he is entitled to compensatory or punitive damages.  In response, plaintiff emphasizes that bugs bit him while he slept and destroyed his property and food, and defendants took no action other than to submit work orders for

7

pest control.  He also asserts that defendants improperly continued to order pest control even though it did not work.  The court will address each of defendants' arguments in turn.

### A. Objective Component

Taken together, a reasonable jury might conclude that the combination of ant and other insect infestations and a dilapidating wall near his bed deprived plaintiff of the basic human needs of sanitation and ventilation in violation of the Eighth Amendment.  *See Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987) (prison officials must provide prisoners with, among other things, adequate sanitation and ventilation); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (separate conditions of confinement may combine to transform what might otherwise have been a mere inconvenience into a constitutional problem).  In particular, pest infestations may deprive an inmate of the "basic human need of rudimentary sanitation in violation of the Eighth Amendment."  *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (pest infestation and lack of adequate cleaning supplies, taken together, deprive inmate of "rudimentary sanitation"); *see also Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("We have held that a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a [constitutional] violation.").

Seventh Circuit precedent also offers guideposts as to the level of pest infestations that violates the Eighth Amendment.  On the one hand, in *Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015), the Seventh Circuit concluded that plaintiff *did not* state an Eighth Amendment claim by alleging that "[s]piders, rats, roaches, [centipedes], [flies], gnats and beetles are on the tier[,] also there are nests of spiders under the radiators[,] roaches and

gnats make their home in the showers and toilet area." *Id.* at 312-13 (quotation marks omitted). The court reasoned that those allegations "left [the court] in the dark as to how extensive the infestations are and how the pests affect [plaintiff]," noting that plaintiff did not allege that the pests were in his cell, had come into contact with him or his property, or had bitten or stung him. *Id.* Likewise, in *Sain*, the Seventh Circuit concluded that plaintiff had not shown a constitutional violation when he asserted that, over the course of six years, he often saw cockroaches crawling in his cell and was bitten twice, but an exterminator visited his cell about once every month and a half. *Sain*, 512 F.3d at 894. On the other hand, in *White v. Monohan*, 326 F. App'x 385 (7th Cir. 2009), the court concluded that, although a close case, plaintiff *did* state an Eighth Amendment claim when he alleged that "*for over five years* the bugs, roaches, spiders, wasps, and bees had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries." *Id.* at 387-88 (emphasis added, quotation marks omitted and alteration adopted). Next, in *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), the Seventh Circuit concluded that plaintiff stated an Eighth Amendment claim when he alleged that *for 16 months*, cockroaches were "everywhere," "crawling on his body" (along with mice) and "constantly awaken [ing]" him, and "causing the environment to be unsanitary." *Id.* at 1431 (quotation marks omitted).

The Seventh Circuit has also concluded that pest infestations combined with other problems can violate the Eighth Amendment. In *Gray*, the court concluded that plaintiff's Eighth Amendment claim survived summary judgment, having claimed to have endured "myriad" infestations and a lack of access to adequate cleaning supplies for some 15 years.

*Gray*, 826 F.3d at 1003, 1006.  In that case, plaintiff also asserted that he saw cockroaches at least every other day, birds flew and nested all over the prison, mice ate his food, and the cell block was infested with other bugs.  *Id.* at 1003-04.  Moreover, the source of the infestations was the prison's repeated failure to fix broken windows and holes in the wall, which allowed birds and other pests to re-enter as soon as they were removed.  *Id.* at 1004.  Plaintiff was allowed only one towel, which was replaced every eight months, and some watered-down disinfectant spray, but he did not have access to mops, brooms or buckets.  *Id.*  Further, while he could buy soap from the commissary, he could not store it.  *Id.*  Likewise, in *Bentz v. Hardy*, 638 F. App'x 535 (7th Cir. 2016), the Seventh Circuit determined that plaintiff's Eighth Amendment claim survived summary judgment because he claimed that the window to his cell was stuck open for about six months, exposing him to cold and rain, a wet light switch shocked him, cockroaches and earwigs infested his cell and crawled on him at night, the cell was filthy with paint and plaster falling from the walls, the cold water faucet barely worked, and his metal stool had sharp, rusty edges.  *Id.* at 536.  The court concluded that these reported conditions "at least in combination, if not alone" violated the Eighth Amendment.  *Id.* at 536-37.

In this case, the severity of plaintiff's ant infestation falls somewhere between *Smith* and *Sain* on the one end, and *White, Antonelli, Gray*, and *Bentz* on the other.  Unlike the plaintiff in *Smith*, who did not allege that pests were present in his cell, Page asserts that there were "many nights" where ants crawled over him and in his mouth, bit him, ate his food, and destroyed his property.  Plaintiff also appears to have suffered worse effects from the ant infestation than the plaintiff in *Sain*, who claimed to have been bitten only twice

in five years.  To be sure, the 4-month-long infestation that plaintiff alleges is shorter than those that the Seventh Circuit has recognized as violating the Eighth Amendment -- with the shortest duration being a 6-month-long cockroach and earwig infestation (along with other adverse conditions) in *Bentz*.  While plaintiff asserts that the ant infestation and dilapidated wall lasted longer because those conditions existed *before* he moved into Room 106, that fact does not show *he* endured objectively adverse conditions for a longer period.  Still, given the claimed severity of the ant infestation during his stay, a reasonable jury might conclude that he was deprived "of the minimal civilized measure of life's necessities."

Moreover, even if the ant infestation was insufficiently adverse on its own to support an Eighth Amendment claim, a reasonable jury might conclude that the infestation, combined with the dilapidated wall, violated the Eighth Amendment.  In *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), the Seventh Circuit recognized that poor ventilation during plaintiffs' 126-day imprisonment may violate an inmate's Eighth Amendment right to humane conditions of confinement.  *Id.* at 473, 486.  In *Board*, the court found plaintiffs satisfied the objective prong of their claims by demonstrating that the poor ventilation and airborne contaminants -- such as black mold and fiberglass dust -- caused them to suffer nosebleeds, respiratory distress and possible long-term consequences, such as worsening asthma.  *Id.*  Here, because of water damage from an adjacent shower, plaintiff asserts that the wall next to his bed became dilapidated, with dust and plaster falling onto his bed and apparently, eventually exacerbating his asthma and COPD.  Accordingly, the combination of all these conditions may be sufficient for a

reasonable jury to conclude that plaintiff experienced objectively adverse living conditions, particularly given the claimed severity of the ant infestation.

## B. Subjective Component

When adding in plaintiff's burden to show defendants acted with "deliberate indifference," however, the clarity of current case law becomes substantially murkier.  To satisfy this burden, a jury would have to find that a defendant was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Thus, deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, although it requires something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id.* at 837.  The court considers the evidence against each defendant with this burden in mind below.

### 1. Supervisor Leinweber

Supervisor Leinweber argues that he acted reasonably by having plaintiff's room sprayed for pests and inspecting his room, but there are material disputes of fact that preclude summary judgment in Leinweber's favor on this ground.  It is undisputed that pest control sprayed plaintiff's room, but taking plaintiff's allegation that there were

"gaping" holes in the baseboard in a light most favorable to him, a reasonable jury might find Leinweber should have known mere spraying might be ineffective. Moreover, "persisting in an ineffective method of pest control may be evidence of deliberate indifference." *Bentz*, 638 F. App'x at 537.

Further, there is a factual dispute about whether Leinweber inspected Page's room at all. Leinweber asserts that he did inspect it, but could see nothing wrong with it, while plaintiff asserts that Leinweber never came to his room. Assuming a jury were to resolve these factual disputes against Leinweber, a jury might infer deliberate indifference.

### 2.  Officer Brown and Sergeant Anderson

It is a closer question, but a reasonable jury might also conclude that (presumably Officer) Brown and Sergeant Anderson were deliberately indifferent. Although it is undisputed that each of these defendants submitted work orders on plaintiff's behalf *and* were not ultimately responsible for repairing his room, there is *some* evidence that they ignored plaintiff's concerns about his room and the lack of meaningful repairs. In particular, as to Sergeant Anderson, there is a dispute of fact as to whether he refused to move plaintiff to a different room after plaintiff asked to be moved. Moreover, plaintiff asserts that he complained to Anderson in May that the room was worsening his respiratory conditions, but Anderson only told him to stop complaining while he submitted a work order. Plaintiff asserts that he also complained to Officer Brown in May about his room conditions worsening his respiratory issues, and Brown told him that he would submit a work order to address the issue. Since there is no evidence that Anderson or Brown actually submitted a work order for plaintiff's room in May, this too might give rise to an inference

13

of deliberate indifference to plaintiff's plight by these defendants, although in fairness to these defendants, Unit Manager Weber *had* already submitted a work order about the wall and ant infestation earlier in May, and submission of multiple work orders about the same issue would prove useless.  Nevertheless, given that plaintiff complained about his room conditions, and Anderson and Brown allegedly did nothing and told him to stop complaining, a reasonable jury might still infer they were deliberately indifferent.

### 3.  Remaining Defendants

Plaintiff would also hold Warden Bryant, Sergeant Duran and Unit Manager Weber liable for ignoring his conditions of confinement.  However, based on the evidence before the court at summary judgment, no reasonable jury could conclude that these defendants were deliberately indifferent to his conditions of confinement.

Specifically, plaintiff's assertion that he complained about the conditions of his room to Warden Bryant and asked to be moved on unspecified dates is simply too vague to defeat summary judgment, especially when he provides no evidence as to what Bryant did in response.  *See Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist., 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("[T]o withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue [of fact] and may not rely on vague, conclusory allegations." (emphasis in original)); (Page Decl. (dkt. #36-1) ¶ 50.)  While plaintiff also asserts that he overheard a sergeant telling Bryant about the infestation and dilapidated wall on June 16, that was *after* plaintiff had been moved from the room and is not a basis for showing that Bryant acted with deliberate indifference.  (Page Decl. (dkt. #36-1) ¶ 60.)

14

Plaintiff's evidence against Sergeant Duran also fails to support a finding of deliberate indifference.  For one, it is undisputed that Duran submitted an urgent work order on plaintiff's behalf after plaintiff complained to him about the room conditions, which would appear to preclude a finding that Duran was deliberately indifferent to plaintiff's plight.  While plaintiff also asserts that he again complained to Duran in May about his room conditions, like plaintiff's allegation against Bryant, that allegation alone is simply too vague and too late to support a jury's finding of deliberate indifference, especially having again offered no evidence as to Duran's response, if any.

Plaintiff offers slightly more specific allegations against Unit Manager Weber, asserting that he told Weber about the infestation, dilapidated wall and his worsening respiratory issues in May.  (*Id.* ¶¶ 35, 89.)  However, apparently after plaintiff complained in May, the undisputed evidence also shows that Weber submitted a work order, noting pieces of the wall and ceiling were falling on plaintiff while he was sleeping *and* there were ants in the room, as well as that the bathroom needed to be sealed.  The fact that Weber submitted a work order in the same month that plaintiff complained, distinguishes Weber's situation from Anderson's and Brown's, as a jury could only speculate that plaintiff complained to Weber *after* he submitted the work order and he then ignored plaintiff's complaint, albeit for a short, few weeks before plaintiff's move out of Room 106.  *See Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) ("[court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture" (quotation marks omitted)).  Also, while plaintiff might wish that Weber had done something else, or that the repairs had been more effective, it is

15

undisputed that Weber was not responsible for making repairs at Oakhill. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("no prisoner is entitled to insist that one employee do another's job"). Accordingly, defendants' motion for summary judgment on the merits of plaintiff's deliberate indifference claims against defendants Bryant, Duran and Weber will be granted.

## II. Qualified Immunity

Even though the court has concluded that a reasonable jury *could* find for plaintiff on his Eighth Amendment claims against Leinweber, Brown and Anderson, these defendants are entitled to qualified immunity given the lack of any existing, controlling precedent holding an institutional defendant responsible under the Eighth Amendment of a sufficiently equivalent set of facts, including equivalent objective conditions and length of a subjective need to act. Specifically, under the doctrine of qualified immunity, a plaintiff may not obtain damages from a defendant for a constitutional violation unless the plaintiff shows not only that the defendant violated his rights, but also that his rights were "clearly established" at the relevant time. *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019). Plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case decided in his favor; or (2) a more general constitutional rule that applies "with obvious clarity" to defendants' particular conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021). Plaintiff has cited no authority -- and the court's own research has revealed none -- establishing that prison officials violate the Eighth Amendment by permitting a pest infestation and dilapidated wall to persist for, at most, 81 days.

16

Instead, plaintiff has identified cases where: (1) the pest infestation was considerably longer than what plaintiff endured *Bentz*, 638 F. App'x 536-37 (6 months); *Antonelli*, 81 F.3d at 1431 (16 months); *White*, 326 F. App'x at 387-88 (5 years); *Gray*, 826 F.3d at 1003, 1006 (apparently 15 years); (2) the ventilation problems lasted longer *Board*, 394 F.3d at 473, 486 (126 days); and (3) the conditions were far worse than what plaintiff experienced.  *Bentz*, 638 F. App'x at 536-37 (plaintiff's window was stuck open exposing him to rain and cold temperatures, wet light switch shocked him and cockroaches and earwigs infested his filthy cell).

Here, defendants knew about the ant infestation for about 81 days (roughly from the date of the first ant-related work order to the date he was moved to a new cell), which is shorter than any set of conditions recognized as violating the Eighth Amendment by the Seventh Circuit.  That is particularly true when, in response to defendants' work orders, plaintiff's room was sprayed for pests 3 times during those 81 days (or once every 27 days). Next, the amount of time that defendants knew about the dust problems in his cell is even shorter given that plaintiff only began complaining about the room's effect on his respiratory conditions "sometime in May," so defendants knew about the room's alleged effect on his health for a *maximum* of 44 days before moving him.  Thus, plaintiff's alleged ant infestation and ventilation problems fall well short of the types of conditions that the Seventh Circuit has at least recognized to date as violating the Eighth Amendment, so that a reasonable prison official in defendants' position would *not* have understood that he was violating it.  *See Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022) ("[R]ight is 'clearly established' for qualified immunity purposes if its 'contours were sufficiently definite that

any reasonable official in the defendant's shoes would have understood that he was violating it,'" and "clearly established law share[s] specific details with the facts of the case at hand.") (citing *White v. Pauly*, 580 U.S. 73 (2017), and quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)).  Accordingly, the court will grant summary judgment to defendants Leinweber, Brown and Anderson on qualified immunity grounds.[6]

### III. Dismissal of Plaintiff's Remaining State Negligence Claims

This court does not normally exercise supplemental jurisdiction over state law claims once the underlying federal claims fall away.   28 U.S.C. § 1367(c)(3); *Burritt v. Diflefsen*, 807 F.3d 239, 252 (7th Cir. 2015).  Since plaintiff's federal claims have been lost on the merits or under the doctrine of qualified immunity, the court will dismiss his remaining state law claims without prejudice.  Subject to the applicable Wisconsin statute of limitations, plaintiff may pursue his negligence claims against defendants in state court.

ORDER

IT IS ORDERED that:

1)  Defendants' motion for summary judgment (dkt. #26) is GRANTED.

2)  Plaintiff's motion to file a sur reply brief (dkt. #51) is GRANTED.

3)  Defendants' motion to stay case deadlines and trial date (dkt. #55) is DENIED AS MOOT.

---

[6] Because the court is granting defendants' motion for summary judgment on the merits and qualified immunity grounds, the court need not address their damages arguments.

4)  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 26th day of June, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge